UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

In re:  Konstantinos Ioannis Katsiroumbas,

                Debtor.

Case No. 16-31762
Chapter 7

Frank H. Suits, Jr.,

                Plaintiff,

v.

Konstantinos Ioannis Katsiroumbas,
  a/k/a Gus Kats

                Defendant.

Adv. Proc. No. 17-50007

Appearances:

Edward Crossmore

                *for Plaintiff*
The Crossmore Law Office
115 West Green Street
Ithaca, NY 14850

Zachary DeCurtis McDonald

                *for Defendant*
Orville & McDonald Law, PC
30 Riverside Drive
Binghamton, NY 13905

**Memorandum-Decision and Order**

Konstantinos Ioannis Katsiroumbas ("Debtor") filed a chapter 7 bankruptcy case on December 28, 2016. Frank H. Suits, Jr. ("Plaintiff") holds two money judgments against Debtor, totaling $407,775.23. Plaintiff alleges that (i) Debtor's list of assets on his schedules A and B are false; (ii) Debtor has failed to keep sufficient records from which his financial condition can be determined; (iii) Debtor has failed to satisfactorily explain the loss, disappearance or disposition of assets and (iv) Debtor has knowingly and fraudulently in connection with this case made one or more false oaths. Plaintiff seeks an order denying Debtor a discharge pursuant to 11 U.S.C. §§

1

727(a)(2)(A), (a)(3), (a)(4)(A), and (a)(5).[1] On March 20, 2018, the court held a trial, the parties filed post-trial briefs and the matter is now before the court for decision.[2] For the reasons that follow, the court finds that Debtor is not eligible for discharge.

---

[1] Unless otherwise noted, all sectional references in this decision are to Title 11 of the United States Code.

[2] The evidentiary record includes

(A) the following jointly-offered exhibits: Greek promissory note for $650,000 dated 6/23/2006 (Ex. 15A), Certified translation of Ex. 15A (Ex. 16B), Private agreement in Greek between Debtor and property purchaser dated 7/15/2013 (Ex. 27C), Certified translation of Ex. 27C (Ex. 28D), Installment income tax forms for the years 2006-2013 (Ex. 19H, 20I, 21J, 22K, 23L, 24M, 25N, 26O), Record of payments to Debtor between 6/22/2006 and 5/1/2009 prepared by Jack Sardis, Debtor's accountant (Ex. 17P).

(B) The following exhibits introduced by Plaintiff: Deposition of Debtor dated 4/6/2011 (Ex. 1), Deposition of Debtor dated 11/9/2011 (Ex. 2), Deposition of Debtor dated 1/29/2016 (Ex. 3), Deposition of Debtor dated 6/29/2016 (Ex. 4), Deposition of Debtor dated 11/10/2017 (Ex. 5), Deposition of Peter Constantine dated 11/17/2017 (Ex. 6), Deposition of Peter Galbraith, Esq. dated 3/17/2016 (Ex. 7), Deposition of Kenneth Peworchic, CPA. dated 3/17/2016 (Ex. 8), Judgment of $341,063.52 against Debtor dated 5/18/2015 (Ex. 9), Judgment of $66,711.71 against Debtor dated 5/18/2015 (Ex. 10), Execution against Debtor for $66,711.71 dated 5/20/2015 (Ex. 11), Closing Statement for sale of 151-153 North Street, Dryden dated 6/23/2006 (Ex. 12), Real Property Transfer Reports for 151-153 North Street, Dryden and Ellis Drive, Dryden (Ex. 13 and 14), Record of deposits to Debtor's bank account between 4/10/2009 and 6/3/2013 (Ex. 18), Appraisal of property in Athens, Greece (Ex. 29), State Court Summons and Complaint underlying Plaintiff's claim, dated 3/28/2013 (Ex. 30), Corporate Banking Resolution for Ithaca Pasta dated 5/4/15 (Ex. 32), Bravo Pizzeria Menu (Ex. 33), Printout of Bravo Pizzeria website (Ex. 33), Tompkins County Health Department Summary Reports dated 7/25/2017, 6/23/2017, 6/13/2017 and 10/4/2016 (Exs. 35, 36, 37 and 38) and Tompkins County Health Department renewal reminder dated 6/16/2017 (Ex. 39).

(C) The following exhibits introduced by Debtor: Debtor's bank statements for 5/22/2009-6/16/2009 and 6/21/2013-7/19/2013 (Ex. E and F), Checks to Debtor dated 10/30/2008 totaling $94,000 (Ex. G), Deposit slip $60,000 to Debtor's account dated 6/16/2013 (Ex. Q), Letter from Dirk Galbraith, Esq. regarding Ex. Q (Ex. R), Assignment of proceeds from pending lawsuits from Debtor to Plaintiff (Ex. S) and Account application to Ginsberg's Institutional Foods, Inc. (Ex. T).

(D) Testimony of Debtor; Kathleen Perkins, landlord of Bravo Restaurant, Richard Vanderpool, and representative of Ginsberg's Institutional Foods, Inc.; Ken Peworchik, CPA, Debtor's accountant; Kristee Morgan, Tompkin's County Public Health Department representative; Dirk Galbraith, Esq., Debtor's attorney in a previous matter; and Peter Constantine, Debtor's uncle.

2

**Jurisdiction**

The court has jurisdiction to hear and decide this core proceeding pursuant to 28 U.S.C. §§ 1334(b), 157(a), (b)(1), and (b)(2)(J). This memorandum-decision and order incorporates the court's findings of fact and conclusions of law as permitted by Fed. R. Bankr. P. 7052.

**Background**

In 2006, Debtor sold his successful business, A-1 Restaurant, a pizzeria in Dryden, New York for $1.5 million dollars. The proceeds were payable pursuant to two contracts: (i) $850,000 due at the time of purchase, as reflected in a standard purchase and sale contract written in English and in the New York State real-estate transfer forms and (ii) $650,000 payable in 84 monthly installments at 6% interest, as memorialized in a private agreement in Greek, executed in Greece ("Note").[3] The Note was secured by a mortgage on property located in Greece. The parties dispute whether (i) any pending or recent payments on the Note were properly disclosed on Debtor's schedules, (ii) Debtor satisfactorily explained the receipt and disposition of recent payments on the Note, and (iii) Debtor knowingly and fraudulently misrepresented payments on the Note.

After Debtor closed on the A-1 Restaurant sale, he entered into other restaurant business ventures. Plaintiff's claim arises from one of Debtor's subsequent business ventures. At the time Debtor filed bankruptcy, these businesses were either closed or no longer affiliated with Debtor. In May of 2016, Debtor helped to open and operate Bravo, a pizzeria owned by his uncle, Peter Constantine. The parties dispute the nature of Debtor's work there at the time of his bankruptcy filing, specifically whether he had an ownership interest in the restaurant and whether he received compensation for his work which is not reflected in his bankruptcy schedules. It is undisputed that

---

[3] Each monthly payment on the Note was to be $9,600, adding up to an eventual total of $806,400 after 84 months.

a large portion of Bravo's transactions are in cash, and that the restaurant's process for handling and tracking cash payments is not rigorous.[4] Seven months after Debtor filed for bankruptcy, he acquired sole legal ownership of Bravo.

**Evidence and Testimony Relied upon by Plaintiff**

Plaintiff offers documentary evidence to support his main argument that Debtor (i) was owed money on the Note at the time of the filing, (ii) failed to disclose or concealed that account receivable on his schedules, and (iii) cannot satisfactorily account for payments received on the Note. Documents from the sale of the A-1 Restaurant, including New York State real estate transfer forms, show that only $850,000 of the $1.5 million purchase price was paid upon transfer. Exs. 12, 13, 14. In the separate $650,000 Note, Debtor agreed to be paid the remainder in monthly installments, with interest through August 31, 2013. Exs. 15A and 16B. Plaintiff offers five transcripts of Debtor's depositions.[5] Exs. 1, 2, 3, 4 and 5. In the first two depositions, taken in 2011 in connection with state court litigation, Debtor provided nonspecific, arguably evasive answers regarding the amount due under the Note, and failed to produce records to support his testimony. During the three latter depositions, taken in 2016 and 2017, Debtor unequivocally claimed that there was no longer an outstanding balance on the Note, and that both his right to

---

[4] Customer orders at Bravo are handwritten in order notebooks, creating carbon copies which serve as both order tickets for the kitchen and checks for the customer. When a customer makes a cash payment, it is reflected on both their handwritten check and also on the electronic cash register tape, which reflects what money was placed in the cash register. Mr. Constantine compares the handwritten checks to the cash register tapes on a daily basis, but does not retain the checks for future auditing purposes. After closing at night, Debtor or Mr. Constantine either bring the cash receipts to the bank for deposit, or take it home to deposit the next day. After the money is deposited, the resulting deposit receipts can be compared to the cash register tape to verify that the entire sum was properly deposited.

[5] Depositions dated April 6, 2011, November 9, 2011 and January 29, 2016 were taken in the course of state court litigation. Depositions dated June 29, 2016 and November 10, 2017 were taken in the course of this adversary proceeding.

4

payment and the lien securing the Note had been extinguished in 2013 in exchange for a final payment of $19,210. Exs. 3, 4 and 5. That testimony is consistent with the terms of the agreement which released Debtor's lien. Exs. 27C and 28D.

After establishing the existence of the Note and its terms of repayment, Plaintiff presented evidence regarding actual payments received on the Note. Debtor's tax returns from 2006, 2007, 2008, 2009, 2010, 2011, 2012 and 2013 indicate that Debtor received cumulatively $619,663 in installment payments on the Note.[6] Exs. 19H, 20I, 21J, 22K, 23L, 24M, 25N and 26O. However, Debtor's records of specific payments, including Debtor's accountant's spreadsheet, Debtor's bank records and deposit slips from Debtor's attorney's escrow account, indicate that Debtor received $705,045 in installment payments on the Note.[7] Exs. 17P, 18, R. Debtor offered no evidence to account for the $85,382 discrepancy between his payment records and his representations to the Internal Revenue Service. In addition, Debtor testified that he did not discount the Note, although he did not specifically state whether interest and fees were fully paid.

In support of his arguments that Debtor had undeclared income from Bravo at the time of his filing and an undeclared valuable ownership interest in Bravo, Plaintiff presents testimony and documents which illustrate Debtor's involvement with the restaurant. Plaintiff underscores Peter Constantine's pretrial testimony in which he was somewhat vague on Bravo's operational and organizational details, to suggest that he was an owner in name only. Ex. 6. In addition, Plaintiff offers testimony by Debtor and Mr. Constantine that the two men had a history of joint ventures,

---

[6] Debtor's IRS Installment Sale Income forms (IRS Form 6252) for those years state the following income: 2006-$100,460, 2007-$79,500, 2008-$84,404, 2009-$0, 2010-$95,136, 2011-$101,004, 2012-$91,924, and 2013-$67,235.

[7] Ex. 17P shows payments totaling $174,410 through April 10, 2009. Ex. 18 shows payments totaling $470,635 after April 10, 2009. Ex. R shows checks totaling $60,000 remitted to Debtor on July 16, 2013. The total of these recorded payments is $705,045.

5

suggesting that Bravo was a joint venture as well. Documentary evidence of Debtor's involvement with Bravo includes i) his authorization to sign checks on Bravo's bank account, ii) his signature on permit applications to the Tompkins County Health Department ("Health Department"), iii) his name on restaurant advertisements, and iv) his email address and name on Health Department reports and correspondence. Exs. 32, 33, 34, 35, 36, 37 and 38. In support of the further assertion that Debtor received compensation, Plaintiff offers deposition testimony by Debtor and Mr. Constantine which shows that i) Debtor regularly worked at Bravo, ii) Debtor regularly had access to cash from Bravo, and iii) Bravo's cash tracking records are limited. Exs. 4, 5 and 6. Plaintiff proposes that the court infer from this information that Debtor received cash compensation beyond the three $500 paychecks in 2016 which Debtor has disclosed.

**Evidence and Testimony Relied Upon by Debtor**

Debtor's arguments regarding the Note rest heavily upon his own statements, both in deposition testimony and before the court. He does not contest that under the Note he received substantial payments between 2006 and 2013, but he insists that payments ceased in 2013 and that he no longer has any of those funds. Debtor offers documentary evidence of payments received in June 2009, October 2008 and July 2013, in addition to a ledger covering the period from June 22, 2006 to May 1, 2009 which substantially conform to records entered into evidence by Plaintiff. Exs. E, F, G, Q and 17P. Debtor claims that these are all the documents he has, as he did not keep detailed records of the payments he received, and too much time has elapsed for him to reconstruct the records from memory. More importantly, Debtor claims that these payments are moot, as at the time of his bankruptcy filing, he had spent all of the proceeds of the Note.

Debtor's contentions regarding his role in Bravo Restaurant likewise rest upon his testimony. He claims that he helped to start the business, but did not receive compensation, apart

6

from three paychecks at the beginning of the restaurant's operation. He claims that he performs many roles at the restaurant, but is not an owner. He offers both an account application submitted to Ginsberg's Institutional Foods, Inc. and testimony by Richard Vanderpool, an employee of that company, which indicate that Debtor neither opened Bravo Restaurant's account nor held himself out as the business's owner in dealings with suppliers. He also offered the testimony of Kathleen Perkins, Bravo Restaurant's landlord, to prove that Debtor is neither a signatory on the lease, nor was he involved in any negotiations related to the lease.

**Discussion**

Plaintiff bases his opposition to discharge on three factual claims: i) that Debtor misrepresented his business affiliation with Bravo in his bankruptcy case, ii) that Debtor misrepresented the status of installment payments and the security interest he obtained in property from his sale of A-1 Restaurant and iii) that Debtor lacks sufficient documentation to allow a creditor to assess Debtor's financial condition. These factual allegations must be analyzed separately under each subsection of 11 U.S.C. § 727 pled by Plaintiff, who bears the burden of establishing each element of a § 727(a) claim by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. at 287. The extreme penalty of denial of a debtor's discharge under § 727(a) "must be construed strictly against those who object to the debtor's discharge and liberally in favor of the bankrupt." *In re Chalasani*, 92 F.3d 1300, 1310 (2d. Cir. 1996) (internal quotations omitted).

*11 U.S.C. § 727(a)(2)(A)*

> In pertinent part, 11 U.S.C. § 727(a)(2)(A) provides that:
>
> [t]he court shall grant the debtor a discharge, unless—the debtor, with intent to hinder, delay, or defraud a creditor… has transferred, removed, destroyed, mutilated, or concealed …—property of the debtor, within one year before the date of the filing of the petition."

7

Establishing a claim under section § 727(a)(2) "requires a showing of actual intent to hinder, delay or defraud; a showing of constructive intent is insufficient." *Pisculli v. T.S. Haulers, Inc. (In re Pisculli)*, 426 B.R. 52, 66 (E.D.N.Y. 2010), *aff'd*, 408 F. App'x 477. As it is rare for a debtor to freely admit the intent to hinder, delay or defraud creditors, the party objecting to discharge generally must rely upon circumstantial evidence or inferences drawn from a debtor's conduct. *See Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582–83 (2d Cir. 1983); *Pisculli*, 426 B.R. at 66. The determination regarding a debtor's intent often will turn on the court's assessment of the debtor's credibility.

Plaintiff's counsel has not articulated what conduct of Debtor should be analyzed under this subsection. Doc. 39. In light of the scope of the testimony offered at trial, the court shall consider the narrow issues of whether Debtor wrongfully concealed i) an ownership interest in Bravo, ii) income from Bravo, iii) payments due on the Note at the time Debtor filed for bankruptcy and iv) the status of a lien Debtor held on real property in Greece. If the court finds that any of these concealments occurred, the court shall proceed to analyze Debtor's intent.

The court credits testimony by Debtor and Mr. Constantine that Debtor was heavily involved in opening and operating Bravo in May 2015, but that he did not hold an ownership interest pre-petition. This testimony is consistent with their business history and family relationship. Documentary evidence introduced by Plaintiff including the restaurant's advertising materials and website plainly indicate Debtor's involvement, but not necessarily any ownership interest. Exs. 33, 34. Similarly, health department records demonstrate Debtor's involvement as a key employee, manager, or contact for the agency, but do not establish an ownership interest. Exs. 35, 36, 38. Richard Vanderpool and Kathleen Perkins, respectively Bravo's wholesale food supplier and landlord, testified that Mr. Constantine signed their contracts and represented himself

8

as owner in negotiations. It is conceivable that a restaurant owner would delegate many operational tasks to an employee, including tasks of the type that Debtor performed.[8] Based upon the testimony and other evidence produced at trial, the court finds that Plaintiff did not establish that Debtor had an ownership interest in Bravo at the time he filed for bankruptcy, therefore, Plaintiff cannot establish that Debtor concealed such an interest.

The court next considers evidence that Debtor concealed income from Bravo at the time of his filing. It is undisputed that Debtor spent significant time working at the restaurant on a weekly basis. However, Debtor testified both in a pre-trial deposition and at trial, that he received only three $500 paychecks for that work, in the months of May, June, and July of 2015. During the subsequent 17 months, Debtor claims that he worked more than forty hours per week without compensation, aside from free meals at the restaurant. Plaintiff adduced deposition testimony showing that Debtor had physical access to Bravo's cash during that period, and further, that the restaurant does not retain customer checks. As such, there is no documentary evidence available to reconcile food orders with register records, opening the possibility that Debtor was compensated with cash. Tips, for example, would not be reflected in register records. However, the restaurant's practices suggest that there would be documentary evidence available to reconcile register records with bank deposits, either supporting or foreclosing any inference that Debtor retained money when he took the cash deposits to the bank. No such evidence was entered into the record. It is plausible, as Plaintiff suggests, that Debtor may have received cash compensation for his work. However, Plaintiff does not offer sufficient evidence to meet the burden of showing that such compensation was paid. The record is also devoid of evidence that Debtor had sources of income

---

[8] It is possible for an owner of a business to be entirely absent, with all operational matters and day-to-day decisions left to an employee. That arrangement would not lead the court to conclude that the employee was in fact an owner of the business.

9

excluded from his filing, such as how Debtor paid his daily living expenses or restaurant records showing missing cash, which the court might have found persuasive on this issue. Absent such proof, the court does not find that Plaintiff met his burden of showing that Debtor received unreported cash income from Bravo at the time of his filing, and, therefore, cannot find that Debtor misrepresented such income.

The court next looks to whether any payments were due on the Note and whether Debtor held a lien on property in Greece at the time of his bankruptcy filing. Though the records associated with the Note are fragmentary, it is clear that more than three years prior to filing, Debtor signed a contract which extinguished both his right to payment under the Note and his lien. Ex. D. In the absence of further evidence or testimony showing that payments were received after that date, that a right to payment survived, or that Debtor continued to hold a lien, the court finds that Plaintiff has not met his burden of showing that the Note was unsatisfied or any payments thereunder were due at the time of filing, and, therefore, cannot find assets that were intentionally concealed in the filing.

### *11 U.S.C. § 727(a)(3)*

A court may deny a debtor a discharge under § 727(a)(3) if "the debtor has…failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case." The purpose of this section is to provide creditors, the trustee and the court with a full and accurate picture of the debtor's financial condition and history so as "to test the completeness of the disclosure requisite to a discharge." *Meridian Bank v. Alten*, 958 F.2d 1226, 1230 (3d Cir.1992).

The Second Circuit enunciated the standard for disclosure and record keeping in *In re Underhill*:

> The law is not unqualified in imposing a requirement to keep books or records, and it does not require that if they are kept they shall be kept in any special form of accounts. It is a question in each instance of reasonableness in the particular circumstances. Complete disclosure is in every case a condition precedent to the granting of the discharge, and if such a disclosure is not possible without the keeping of books or records, then the absence of such amounts to that failure to which the act applies.

*In re Underhill*, 82 F.2d 258, 259-60 (2d Cir. 1936) *cert. denied*, 299 U.S. 546 (1936) (internal citations omitted). Whether to deny a discharge for the debtor's failure to keep or preserve adequate financial records has been found subject to the following test: "whether there is available written evidence made and preserved from which debtor's present financial condition, and his recent business transactions for a reasonable period in the past, may be ascertained with substantial completeness and accuracy." *State Bank of India v. Sethi (In re Sethi)*, 250 B.R. 831, 838 (Bankr. E.D.N.Y. 2000). The Second Circuit has previously recited a list of factors which should inform the court's determination of a reasonable period and reasonable records requirement:

> the education, experience, and sophistication of the debtor; the volume of the debtor's business; the complexity of the debtor's business; the amount of credit extended to debtor in his business; and any other circumstances that should be considered in the interest of justice.

*In re Cacioli*, 463 F.3d 229, 237 (2d Cir. 2006). A reasonable period may extend back as far as ten years. See *In re Racer*, 580 B.R. 45, 53 (Bankr. E.D.N.Y. 2018) (holding that missing records from seven years before filing were not too remote to consider under the statute); See also *In re Scott*, 566 B.R. 471, 479 (Bankr. N.D. Ohio 2017)(holding that a ten-year period was a reasonable lookback period).

The burden under this section follows a shifting scheme:

The initial burden lies with the creditor to show that the debtor failed to keep and preserve any books or records from which the debtor's financial condition or

11

business transactions might be ascertained. If the creditor shows the absence of records, the burden falls upon the bankrupt to satisfy the court that his failure to produce them was justified.

*In re Cacioli*, 463 F.3d 229, 235 (2d Cir. 2006) citing *White v. Schoenfeld*, 117 F.2d 131, 132 (2d Cir. 1941), see also *In re Kran*, 760 F.3d 206, 210 (2d Cir. 2014).

As a preliminary matter, the court finds that the repayment status of the Note is within the scope of § 727(a)(3), both temporally and in terms of relevancy to Debtor's bankruptcy. There is no evidence that payments were still due at the time of Debtor's bankruptcy filing, and strong evidence that the final payments on the Note occurred in July 2013, just over three years before the petition date. Ex. Q. Considering the large amount of money involved, however, the court finds it reasonable that an inquiry should encompass the total amount received toward its satisfaction, even though that requires a ten-year lookback at Debtor's records.[9] Furthermore, applying the factors from *In re Cacioli*, the court considers that although Debtor testified that his formal education ended at high school, he has the experience and sophistication one would expect of a highly experienced restauranteur and small business owner, such that a reliable record of $9,600 monthly payments would be reasonable to expect. There is no evidence that the volume and complexity of Debtor's non-restaurant installment income is so great that a record of payments would be a high bar. Indeed, non-contemporaneous bank records would suffice. The court further notes that Debtor would need six years of records under 26 U.S.C. §6501(e) were he to be subject to tax audit. Therefore, both temporally and in terms of subject matter, a record of the Note's repayment is a reasonable expectation.

---

[9] The record does not include documentary evidence regarding Debtor's expenditures in the period leading up to his bankruptcy, other than Debtor's representation that he spent substantially all of his money. The court need not make that inquiry, however, as without knowing the sums received on the Note, it would be impossible for a Creditor to assess Debtor's financial situation, regardless of the scale of his expenditures.

12

Having settled that the Note falls within § 727(a)(3), the court shall examine documentary evidence that Debtor has been able to produce, to see whether it is facially sufficient to allow for an assessment of Debtor's financial position.[10] Debtor offers tax documents for the years 2006-2013 on which he represents his installment income on the Note. (Exs. 19H, 20I, 21J, 22K, 23L, 24M, 25N and 26O). However, those tax documents are facially contradicted by other direct evidence of payments. Debtor testified that his tax submittals were based on his recollections and were potentially inaccurate. Exs. 17P, 18 and 5 35:19-37:21. As such, the tax records are not reliable documentary evidence from which Debtor's financial condition can be ascertained. In addition, Debtor produced two ledgers, which respectively detail payments on the Note from June 22, 2006 through May 1, 2009 and from April 10, 2009 through June 3, 2013.[11] Exs. 17/P, 18. The first ledger reflects just two payments of $9,605 in 2006, no payments in 2007, widely varying payments from January 2008 to March 2009, and then consistent $9,600 or $9605 monthly payments (with just one missed) from April 2009 through June 2013.[12] *Id.* Those ledgers exclude at least one payment which is shown in evidence: three checks totaling $60,000 received in July 2013. Exs. Q and R. Debtor also offers the original agreement which created the Note, which lists its total amount at $900,000. Finally, Debtor offers the agreement which ended payments and released the Lien securing the Note in return for the July and August payments on the Note, totaling $19,210. Exs. A and B at 2, Exs. C and D at 2. Debtor testified that the $900,000 figure was

---

[10] Analysis of claims under this section concerns only the books or records available from a defendant. Incomplete or contradictory verbal representations are irrelevant, except to the extent that they reveal the existence of transactions which are not reflected in the documentary evidence.
[11] These ledgers were not created contemporaneously with receipt of payments. However, on the basis that they were created by professionals with knowledge of payments under the Note, the court considers them to reflect
[12] Transfers of $9,605 included both the $9,600 payment under the contract and $5 to cover transaction fees. The transaction fee was not consistently included in payments until 2010.

13

inaccurate, but also repeatedly testified that the Note was paid in full, with no discount, which would suggest payments were well in excess of $800,000. A table comparing the Note's payment history as shown in various sources follows:

| Year | Payments in Ledgers | Payments not in Ledgers | Tot. of Payments in Ledgers and Other Records | Tot. Payments Reported to the IRS | Tot. Payments Due under the Note |
|---|---|---|---|---|---|
| 2006 | $ 19,210.00 | $ - | $ 19,210.00 | $ 100,460.00 | $ 57,600.00 |
| 2007 | $ - | $ - | $ - | $ 79,500.00 | $ 115,200.00 |
| 2008 | $ 133,100.00 | $ - | $ 133,100.00 | $ 84,404.00 | $ 115,200.00 |
| 2009 | $ 89,325.00 | $ - | $ 89,325.00 | $ - | $ 115,200.00 |
| 2010 | $ 124,865.00 | $ - | $ 115,260.00 | $ 95,136.00 | $ 115,200.00 |
| 2011 | $ 105,655.00 | $ - | $ 115,260.00 | $ 101,004.00 | $ 115,200.00 |
| 2012 | $ 115,260.00 | $ - | $ 115,260.00 | $ 91,924.00 | $ 115,200.00 |
| 2013 | $ 57,630.00 | $ 60,000 | $ 117,630.00 | $ 67,235.00 | $ 67,200.00 |
| **Total** | **$ 645,045.00** | n/a | **$ 705,045.00** | **$ 619,663.00** | **$ 806,400.00** |
| Source(s) | Exs. 17, 18, P | Exs. G, R | Exs. 17, 18, P, G, R | Exs. H, I, J, K, L, M, N, O | Calculated based on $9,600/mo for 84 months. |

The gold standard for records retained by an individual, unsophisticated debtor would include deposit slips, copies of checks, and bank statements; however, only a handful of such contemporaneous documents are in evidence. Exs. E, F, G and Q. The ledgers which summarize deposits during the repayment period are more complete. However, the court notes that this documentary evidence suggests that Debtor over-reported his installment income in 2006 and 2007, significantly under-reported his installment income to the IRS in the years 2009 through 2013, and dramatically under-reported his income over the life of the Note. The fact that Debtor has no records for payments in 2007, yet paid taxes on $79,500 of income, casts doubt upon the accuracy of the ledgers. In addition, contemporaneous deposit records contradict the terms of the agreement which released the lien, as Debtor received $60,000 in payments in July 2013 and no payments in August 2013, rather than $9,605 in each of those months. Though the court does not demand that any one source of evidence fully explain the Note's status, all the proffered non-

14

contemporaneous evidence is unreliable or contradictory in light of other evidence, and contemporaneous evidence only accounts for a small fraction of payments on the Note. On the basis of that shortcoming and the inconsistencies in Debtor's records, the court finds that Plaintiff has carried his burden to show that records maintained by Debtor are inadequate.

The burden thus shifts to Debtor to adequately explain the lack of records.[13] He has offered several general responses, first stating that the Note was irrelevant, as it was fully satisfied at the time of his filing, and second stating that the payments under the Note were too far in the past for him to have retained records. Ex. 5 20:24-20:11, 19:20-40:17, 43:1-6. Debtor's testimony did not address the facial inconsistency between his filed tax returns and his account records, beyond claiming an overpayment of taxes at some point. Nor did Debtor's testimony explain the lump sum payment in 2013, which was inconsistent with the agreement terminating his lien. The court is not satisfied with Debtor's explanations of these issues. Understanding and explaining these inconsistencies is well within Debtor's level of sophistication, and the court does not credit Debtor's testimony both in depositions and at trial that he is unable to recall the circumstances surrounding the $60,000 payment in 2013, just three years before his bankruptcy filing. That aside, § 727(a)(3) has no element of intent, and the court does not make a finding on that subjective matter. The court instead narrowly finds that the documentary evidence produced by Debtor, consisting of tax records, ledgers, and contemporaneous records is contradictory and incomplete, and thus insufficient to allow assessment of Debtor's financial condition, and that Debtor's testimony did not adequately resolve the ambiguities. Therefore, the court finds that Debtor's discharge shall be denied pursuant to § 727(a)(3).

---

[13] The only documentary evidence before the court regarding Debtor's financial condition pertains to the Note. Therefore, the court is limited in its analysis, and unable to assess the overall sufficiency of Debtor's records.

15

*11 U.S.C. § 727(a)(4)(A)*

The making of "a false oath or account" is grounds for denial of a discharge under § 727(a)(4). To prevail on this claim, Plaintiff must establish: "that (1) the [Debtor] made a statement under oath; (2) the statement was false; (3) the [Debtor] knew that the statement was false; (4) the [Debtor] made the statement with fraudulent intent; and (5) that the statement related materially to the bankruptcy case." *In re Dubrowsky*, 244 B.R. 560, 572 (E.D.N.Y. 2000) (internal citations omitted). Statements in the Debtor's filed schedules and statement of financial affairs as well as the Debtor's testimony at the 341 meeting and his Rule 2004 deposition constitute statements under oath for purposes of § 727(a)(4)(A). *In re Moreo*, 437 B.R. 40, 60 (E.D.N.Y. 2010). "Both omissions and affirmative misstatements qualify as false statements under § 727(a)(2)(4)." *Id.*

Plaintiff argues that Debtor's representations both in testimony and written submittals to the court regarding compensation from Bravo and ownership of Bravo qualify as false statements under this statute. As discussed previously with regard to Plaintiff's § 727(a)(2)(A) claim, the court finds that i) Plaintiff has not carried his burden to show that Debtor had an ownership interest in the restaurant, and ii) Plaintiff has not carried his burden to show that Debtor made false statements about his personal income from the restaurant. Therefore, the court cannot find that Debtor made a false statement regarding either of these underlying facts. The court need not proceed to address Debtor's intent or the materiality of Debtor's representations in the bankruptcy, as the element of misrepresentation is not satisfied.

Plaintiff has not specifically raised the applicability of § 727(a)(4)(A) to Debtor's deposition testimony regarding the Note. However, in light of the testimony offered at trial and included in the record, the court shall consider this issue. The court finds that Debtor's testimony

16

in his two depositions related to this matter include incomplete, unsatisfactory, or misleading answers to Plaintiff's questions regarding the Note.[14] Ex. 4 24:15-27:2 Notably, Debtor claimed ignorance of his own financial affairs in 2017, claiming to have either forgotten or never known details which a reasonable person would have known. These details include the identity of other parties to the Note and the final payment under the Note, despite Debtor's awareness that this information was the subject of the deposition, and Debtor's later testimony demonstrating his knowledge of these details.[15] The court finds that in light of the significant sums of money involved and the relatively recent nature of some of the transactions, Debtor's declarations of ignorance regarding his own finances in depositions were not truthful.[16] Furthermore, several of Debtor's statements are demonstrably false, such as his statement in a pretrial deposition that the final payment on the Note was $19,210, rather than $60,000. Exs. 5 21:19-23:16 and 39:16-40:17. Debtor's hedge that this statement was to the best of his recollection is unpersuasive. That $60,000 lump sum payment was received in 2013, only three years prior to Debtor's bankruptcy filing, Debtor had to travel to New York City to complete paperwork to receive that payment, which

---

[14] Debtor's two 2011 depositions and 2016 deposition were related to separate state court litigation, not the bankruptcy proceeding, and do not fall within the scope of §727(a)(4)(A).

[15] Debtor was evasive regarding the purchaser of A-1 restaurant, insisting that it was a corporation, and that he was ignorant of the individuals involved. Ex. 4 31:14-19, 36-37, 40, and 49:16-50:2. However, he also stated that he has known George Michelis, one of the parties involved in the purchase, for a "long time," and acknowledges that George and Joyce Michelis were parties to the agreement terminating the Note. Ex. 4 39:22-40:1, 50:21-24. The court will not speculate as to why Debtor appears reluctant to share details regarding the Note, but will characterize Debtor's response as evasive.

[16] The court has considered testimony that Debtor suffers from depression, in addition to the confusion that likely surrounded Debtor's rapid slide from prosperity to bankruptcy, as explanatory factors for Debtor's responses under oath. These factors could certainly explain some degree of Debtor's unfamiliarity with his own financial affairs, and further, could explain Debtor's ongoing and persistent failure to prepare for depositions. However, the court does not find this alternate explanation persuasive enough to override evidence strongly suggesting that Debtor was aware of information which he withheld.

arrived via his attorney's escrow account—all details which would have made the transaction memorable. The court does not credit Debtor's implication that details of this event were so minor as to be readily forgotten, and instead finds that Debtor deliberately obfuscated his affairs. The court finds that all of the elements of this section are satisfied. Debtor made statements under oath in pretrial depositions. The court finds that those statements were false. The court further finds that Debtor knew his declarations were false. From the weight of the evidence the court infers that Debtor made the statements with fraudulent intent, hoping to mislead or frustrate another party.[17] Finally, the matters in question—what documents Debtor had and what Debtor knew about his own financial position—are directly related to the bankruptcy. Therefore, on the basis of Debtor's incomplete and misleading answers during his bankruptcy-related depositions, the court finds that Debtor's discharge must be denied pursuant to § 727(a)(4)(A).

## *11 U.S.C. § 727(a)(5)*

Section 727(a)(5) is meant "to deter those [debtors] who attempt to abuse the bankruptcy process by obfuscating the true nature of [their] affairs, and then refusing to provide a credible explanation." *Nof v. Gannon (In re Gannon)*, 173 B.R. 313, 317 (Bankr. S.D.N.Y. 1994) (internal quotation omitted). To sustain an objection under § 727(a)(5), an objecting party must first demonstrate a loss, shortage, or deficiency of estate assets. If the objecting party makes this initial showing, the debtor is given the opportunity to provide a satisfactory explanation. A debtor's explanation need not necessarily be meritorious, but "it must be a good faith explanation of what

---

[17] The court acknowledges that the motivation for Debtor's intentionally misleading statements may have been relatively innocent—an attempt to resist what he viewed as badgering questions or an inquiry into recent painful events, rather than an attempt on Debtor's part to secure any personal pecuniary benefit. However, a finding of fraudulent intent turns on the court's interpretation of Debtor's subjective intent to deceive, not his underlying motivation, and in this case, the court finds that Debtor intended to obstruct or mislead his creditor regarding the details of his past business.

really happened to the assets in question." *Self*, 325 B.R. at 250; *see Doubet, LLC v. Palermo(In re Palermo)*, 370 B.R. 599, 613 (Bankr. S.D.N.Y. 2007) ("[D]ebtor must offer 'much more in the way of explanation than vague generalities'" (quoting *In re Sperling*, 72 F.2d 259, 261 (2d Cir. 1934))).

Creditor argues that there are missing assets, demonstrated by the discrepancy between Debtor's representation that the Note was paid in full and the total payments reflected in Debtor's records. As the recorded payments total substantially less than the sum due under the Note with interest, Creditor would have the court conclude, simply on the basis of poor records, that the balance was actually received and is still in Debtor's possession. The court finds this argument weak—§ 727(a)(5) cannot be read to simply restate § 727(a)(3), such that any flawed records of Debtor's assets automatically constitute lost or concealed assets. Section 727(a)(5) establishes an independent burden on Plaintiff to establish the existence of an undisclosed asset of value. The court's finding under § 727(a)(3) is that records regarding the Note are insufficient to ascertain Debtor's financial position. Those same records do not provide a sufficient basis for the court to find that Debtor had undisclosed assets at the time of his bankruptcy filing. Accordingly, the court finds that Plaintiff has not carried his burden to support a separate basis to deny discharge under § 727(a)(5).

**Conclusion**

For the reasons stated above, a separate judgment shall issue denying Debtor a discharge pursuant to §§ 727(a)(3) and (a)(4)(A) and dismissing the remaining counts of the complaint.

Dated: August 1, 2018
Syracuse, New York

Margaret Cangilos-Ruiz
United States Bankruptcy Judge